KAMEN SOAP PRODUCTS Co., INC., et al., Respondents, v. PRUSANSKY & PRUSANSKY, INC., et al., Appellants.

NATIONAL FACTORS, INC., Respondent, v. PRUSANSKY & PRUSANSKY, INC., et al., Appellants.

First Department, May 13, 1958.

*Benjamin E. Haller* of counsel (*John J. Killea, David A. Ticktin* and *Powers, Kaplan & Berger* with him on the brief; *Mendes & Mount,* attorneys), for appellants.

*Sidney J. Loeb* of counsel (*David Levine* with him on the brief; *Prince & Loeb,* attorneys), for respondents.

BERGAN, J.  Plaintiffs have a judgment against the defendants for $145,185.63 based on a jury's finding that defendants as insurance brokers negligently managed a fire insurance service with the result that there was insufficient coverage at the time of a fire.  Although the judgment runs in favor of three plaintiffs without segregation or apportionment, for convenience we treat Kamen Soap Products, Inc., as the plaintiff.

The Kamen corporation has its principal office in New York, but had a soap factory and crayon plant at Barberton, Ohio.  In addition to these products it manufactured napalm, a highly combustible war material, for the United States Government.

There had been several fires in the plant before its total destruction in July, 1954, which caused the loss on which this action is based.  The plaintiff's fire loss was $434,776.50; it collected $291,075.61 in insurance; recovery measured by the uninsured loss is sought from the defendants.

Defendants had been performing insurance service to the Kamen corporation since about 1949.  A number of disputes arose between the defendant brokers and their client about the servicing of this account; and substantial segments of the testimony in the record, and much of the argument pursued by

the plaintiff in its brief, revolve about its contention that the handling of the account was confused and unsatisfactory since 1952.

The resolution of the controversy by the jury, which has become the foundation of the judgment appealed from, however, sharpens and narrows the area left in dispute on appeal and makes irrelevant much of the argument pursued by respondent. Many of the facts and occurrences relied on have a merely historical interest in the transactions between the parties, without importance in the residual controversy.

The jury by its verdict found in effect that two fire insurance policies which had been obtained through defendant brokers had been cancelled early in 1954 by the insurance companies before their expiration date; and that the defendants negligently failed to advise their client, Kamen corporation, of these cancellations with the result that plaintiff, in the belief that such insurance continued in effect, failed to provide for additional coverage. In respect of other policies in controversy, the jury's verdict was for defendants and plaintiff does not appeal.

Plaintiff in defending the judgment pursues an argument which suggests that somehow the cancellations of these two policies themselves are to be attributed to the brokers; but the record makes it perfectly clear that the cancellations were not effected by the insurance companies due to any failure of the brokers to pay premiums. The premiums not only were paid, but the unearned premiums were rebated in each of the two cancellations and credited to plaintiff's account with defendants; nor is there any proof whatever that a request for cancellation or any other act by the brokers brought about the cancellations which, on the contrary, were effected by the carriers themselves upon their own decision based on the nature of the risk involved.

Nevertheless, it is argued at random, for example, that the failure to utilize a credit balance in 1952 to pay a premium on a policy not found to be a basis for this judgment; the failure to utilize other credits in the same year for premiums on other policies; and "defendants' unauthorized cancellations" of still other policies in 1952 are somehow to be treated as having importance in the issue before us.

The significant issue is quite different from all this. The two policies now important are one written by the Home Insurance Co., No. 8546471, running from December 1, 1951 to December 1, 1954, for $75,000, cancelled January 27, 1954; and one written by Lloyd's Insurers, No. 29070, running from February 9, 1952 to February 9, 1955, for $147,000, cancelled February 1, 1954.

The Home policy was a "warranty" or "guaranty" policy on which the continuance of Lloyd's policy would depend; and the cancellation of the Home policy would be expected to bring about the cancellation of Lloyd's.

Since neither the careless and confused way in which the defendants may have handled plaintiff's insurance business generally in 1952 or 1953, nor their failure to pay premiums, nor any act or direction of theirs is shown by plaintiff to have been a cause of the cancellation by the insurers of January 27 and February 1, 1954, a recovery based on negligence must necessarily rest on a showing that plaintiff did not know of these cancellations; that defendants negligently failed to communicate their knowledge of the cancellations to plaintiff; and the fact plaintiff did not obtain other insurance was the product of such failure of communication without any concurring negligence by plaintiff. On showing these facts, of course, plaintiff had the burden of proof.

It is very clear in the record that plaintiff had prompt knowledge of the cancellation of Home Insurance Policy No. 8546471 on January 27, 1954, which, as it has been noted, was the warranty policy on which the continuance of Lloyd's coverage was based. Plaintiff's president Abraham L. Kamen, testified that he had received written notice of this cancellation on February 1, 1954, and a copy of the notice is in evidence. Liability could not, therefore, be predicated on a failure of defendants to advise plaintiff of this cancellation.

When we turn to the cancellation of the Lloyd's policy on February 1, the record strongly suggests that plaintiff had notice of this cancellation at or immediately after the time of cancellation; and that its purported reliance on the defendants to see that this particular policy of insurance continued, or to notify plaintiff of cancellation, had nothing to do with plaintiff's failure to be adequately insured five months later at the time of the July, 1954 fire.

There is direct proof in the record that in accordance with the practice followed by defendants in doing business with plaintiff a written memorandum, numbered 8818, was sent to plaintiff shortly after February 1, 1954 showing the cancellation on that day of the Lloyd's policy in issue and stating that a return premium credit of $358.57 was due; and there is adequate proof that plaintiff received credit for this premium. Plaintiff denied receiving this notice; but as the result of further discussions between plaintiff and defendants during the spring of 1954 as to what credits or debits ought to be entered in their

account, defendants on April 20, 1954 sent a letter to plaintiff enclosing a long capitulated list of credits and debits, running from May 25, 1952 to February 1, 1954.

These discussions and the list of credits seem to have followed upon a letter of February 23, 1954 in which plaintiff wrote to defendants enclosing a copy of " the latest report which we received " from " our new brokers ". It asked defendants to " cooperate " in explaining a balance shown on defendant's statement to plaintiff, by a statement which would show a breakdown of the account with the " policy number ", type of insurance, period of coverage, and expiration date, and " the amount of reimbursement we will receive on all the cancellations ".

The letter from defendants to plaintiff of April 20 called attention to the fact that there were enclosed " invoices and credits all of which you will find on the statements ". The very last listed item, which seems the terminal point of the business relations between the parties was the following: " Feb. 1, 1954, 8818 29070 $358.57 ". The receipt of this recapitulated statement is not disputed; and it is clear that plaintiff took the return premium credit for the cancellation of the Lloyd policy reflected in the balance shown in the accompanying statement.

But plaintiff's president Kamen testified that although he received this statement he questioned its accuracy and claimed the credit balance should have been greater. It seems incredible that plaintiff, alert to purported inaccuracies in the statement; claiming more credit was due than had been allowed; and asking for invoices, would have left unnoticed and unscrutinized the credit for $358.57, the largest single amount for returned premium of any of the entries of 1954 the year in which plaintiff was terminating business with defendants, and which entry was not only the terminal entry of the account, but showed the policy number " 29070 " of the Lloyd's policy, and number " 8818 " which corresponded to the number of the invoice of cancellation which had been sent to plaintiff.

In other directions the record indicates that plaintiff knew of the February 1 cancellation of the Lloyd policy and placed no reliance on the defendants to see that it was continued in force. Early in 1954 plaintiff, dissatisfied with the management of its insurance by defendants, had turned, as the letter of February 23 indicated, to new insurance brokers. The firm of See and Depew had been retained to handle plaintiff's insurance requirements.

Sometime in " January or February " a conference was held between John D. Depew, a member of plaintiff's new brokerage

firm, and a New York representative of Lloyd's. Mr. Depew testified that Mr. Kamen attended this conference. He further testified that "when I was asked to place insurance for the Kamen Soap Products company, I went to Herbert Weiderman to see if he could write some insurance for me in Lloyd's."

Mr. Depew said that Mr. Kamen was present because he felt that Mr. Kamen "could tell him some things about the risk which I did not know." He and Kamen were told by the Lloyd's representative, not only that he would not write additional insurance for the plaintiff, but that the reason for this was that he "had some insurance which had been cancelled". The new broker added that he did not know these policies had existed "until that time." There can be little doubt that both plaintiff and the new broker then knew that the Lloyd's policy was cancelled.

On March 3, 1954 See and Depew wrote plaintiff that they had completed the examination of "a volume of insurance papers" which plaintiff had given them, and stated they had found additional information "as a result of our check with all of the insurance companies". This, of course, included policies which defendants had handled, because the letter stated that most of the policies had been issued through defendants. The letter was followed by another dated the following day giving data on an additional policy.

From this survey the new brokers concluded that there was a total of $273,750 of insurance in force. The Lloyd's policy for $147,500 which had been cancelled February 1, was not included in the list given. The letter of March 3 reminded plaintiff that "You have stated that you require approximately $850,000 of fire insurance". The letter of March 4 stated that since there appeared to be $273,750 in force, there was "a shortage on the fire insurance of $576,250" from the $850,000 which plaintiff said would meet its requirements.

These letters, written in the contemporaneous movement of events, cast very clear light on the center of the controversy. If, as plaintiff now contends, it believed that the $147,500 policy of Lloyd's continued in force after February 1, and knew that $273,750 was in force as a result of the See and Depew examination of the insurance portfolio, it would not need $576,750 to fill its requirement in order to have $850,000 coverage; it would need only $436,750. Nevertheless, the new brokers bound $560,000 additional insurance "in February" according to their letter of March 4 which referred to "the $560,000 of insurance, which we bound in February". Plaintiff does not

dispute that this much insurance had been bound, but argues that the new brokers were advised to revise the amount needed to fit in with plaintiff's contention that it believed that the Lloyd's policy continued in force.

It is enough to say that when undisputed actions and written statements of the parties are seen in the light of this contention, it does not harmonize with any rational calculation or arrangement of figures; and seems to us to run against the strong current of probability in this case. The subsequent reduction of the coverage bound by the new brokers in February cannot bring home to the defendants a liability for insufficient insurance in July. We regard the verdict for the plaintiff to be against the weight of the credible evidence.

The judgment should be reversed on the law and the facts and a new trial ordered, with costs to appellants to abide the event.

BOTEIN, P. J., BREITEL, FRANK and MCNALLY, JJ., concur.

Judgment unanimously reversed upon the law and upon the facts, and a new trial ordered, with costs to the appellants to abide the event.