**GLOBALNET FINANCIAL.COM, INC., Plaintiff–Appellant,**

v.

**FRANK CRYSTAL & CO., INC., Defendant–Appellee,**

**A.I. Credit Corp., Defendant.**

**Docket No. 04–6679–CV.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 17, 2005.

Decided: May 5, 2006.

Richard D. Wilkinson (Robert D. Chesler, of counsel; Kristina D. Pasko, on the brief), Lowenstein Sandler, P.C., New York, NY, for Plaintiff–Appellant

William C. Kelly (Randolph E. Sarnacki, on the brief), Lustig & Brown, L.L.P., New York, NY, for Defendants–Appellees

Before: KEARSE, MINER, and HALL, Circuit Judges.

MINER, Circuit Judge.

Plaintiff-appellant GlobalNet Financial.com, Inc. ("GlobalNet") appeals from a summary judgment entered in the United States District Court for the Southern District of New York (Sweet, *J.*) in favor of defendant-appellee Frank Crystal & Co., Inc. ("Crystal"). The action was brought against Crystal, an insurance broker, to recover damages arising from Crystal's failure to transmit insurance cancellation notices to GlobalNet. The District Court determined that (i) New York law should apply to GlobalNet's contract claims; (ii) New York law should apply to GlobalNet's tort claims; and (iii) having applied New York law, Crystal was entitled to judgment as a matter of law.

## BACKGROUND

At all relevant times, GlobalNet was in the business of providing on-line news and financial information to private investors in Europe and the United States and to on-line trading facilities. GlobalNet is a Delaware company that had an office in Boca Raton, Florida, at the time that its business relationship with Crystal began. Crystal is a commercial insurance broker incorporated, licensed, and headquartered in New York. Crystal also has offices in various locations in the United States, including two in Florida. Crystal, as an insurance broker, arranged for GlobalNet to purchase directors and officers ("D & O") liability coverage for the period December 30, 1999, to December 30, 2001. The primary D & O policy was issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Un-

ion"), an excess D & O policy was issued by Lloyd's of London, and a second excess D & O policy was issued by Federal Insurance Company. The D & O policies insured GlobalNet for liability for "any wrongful acts" of its officers and directors and did not limit the insured risk to any particular site.

Crystal also arranged for the financing of the premium payments for GlobalNet's D & O coverage through A.I. Credit Corp. ("AICCO"), an affiliate and member of American International Group. Although Crystal never was a party to the premium financing agreement (the "Financing Agreement") between AICCO and GlobalNet, it warranted to AICCO that it had placed the at-issue D & O policies as broker on behalf of GlobalNet. On January 7, 2000, Crystal sent a letter to GlobalNet at its Florida address—7284 W. Palmetto Park Road, Boca Raton, FL 33433 (the "Palmetto Park Road address")—enclosing the proposed premium Financing Agreement. The letter instructed GlobalNet to sign, date, and return the Financing Agreement to Crystal with a check in the amount of $57,231.00, representing the amount of the down payment. The letter also requested that the first installment payment in the amount of $25,052.73 (due January 30, 2000) be paid to AICCO. On or about January 12, 2000, GlobalNet entered into the Financing Agreement with AICCO for the financing of its premium payments for the D & O coverage. The premium payments on GlobalNet's D & O coverage were sent from the GlobalNet Florida office until sometime in "the summer of 200[1]." The payments were sent to AICCO's address in Dallas, Texas, as directed by the payment stub provided by AICCO.

In August 2001, AICCO sent a September 2001 premium Finance Statement (the "Statement"), dated August 1, 2001, to Glo-

balNet at its Palmetto Park Road address. GlobalNet had closed and vacated its office at that address in late June or early July 2001.[1] As a result of GlobalNet's absence from the Palmetto Park Road location, the Statement could not be delivered and was returned to AICCO. The returned envelope bore a legend notifying AICCO of a new address for GlobalNet—225 N.E. Mizner Boulevard, Boca Raton, Florida (the "Mizner address"). AICCO corrected its records to account for GlobalNet's new address and re-sent the September Statement to the Mizner address. According to AICCO, Crystal would not have been advised of the address change by either AICCO or GlobalNet.

On or about October 10, 2001, AICCO sent an Intent to Cancel Notice to GlobalNet, indicating that GlobalNet's D & O coverage would be cancelled, effective October 21, 2001, due to the non-payment of premiums, unless a premium of $25,052.73 and a late fee of $1,252.64 were paid. On or about October 22, 2001, AICCO mailed a Cancellation Notice to GlobalNet, informing it that its D & O policies were cancelled for GlobalNet's failure to pay its premiums. Both the Intent to Cancel Notice and the Cancellation Notice were mailed to the Mizner address.

The Mizner address was occupied by a company called International Capital Growth ("ICG"), which was a company spun-off from GlobalNet in July or August of 2001, before GlobalNet was acquired by NewMedia SPARK. Peter Wallis ("Wallis"), the associate general counsel for GlobalNet, had instructed the Boca Raton Post Office to forward all mail addressed to GlobalNet at the Palmetto address to the Mizner address. Wallis stated that he filed the change of address with the post

office because, "otherwise, [the mail] would have just collected outside the front door . . ., and I still for whatever reason felt a fiduciary responsibility to make sure the mail got through. . . . You know, I mean, I was paid to be outside counsel."

According to GlobalNet, "[m]ail intended for Global[N]et was generally supposed to be forwarded to London." Further, it was the "custom and practice" of someone at the Mizner address to forward mail addressed to GlobalNet to someone in London. However, the Intent to Cancel Notice and the Cancellation Notice, which were sent to the Mizner address, were never received by GlobalNet's London office. Consequently, GlobalNet did not become aware of the missed premium payment, the Notice of Cancellation, or the resulting cancellation of the D & O coverage until late February 2002.

Crystal received both the Notice of Intent to Cancel and the Cancellation Notice in October 2001 at its office in New York City. AICCO also contacted Crystal by telephone concerning the cancellation of GlobalNet's D & O coverage on numerous occasions. Previously, Crystal had received an e-mail from Ron Goldie of GlobalNet, stating that "[w]ith the pending close of the Tender Offer from NewMedia [SPARK] the GLBN.co.uk mailboxes will be closing soon." After the D & O policies were cancelled on October 22, 2001, in accordance with the cancellation notice, they could be reinstated only by the various D & O insurance carriers, including National Union.

GlobalNet claims that it was detrimentally affected by the termination of the D & O policies when, on May 22, 2002, National Union disclaimed coverage for three

---

**1.** At some previous time, responsibility for the financial affairs of GlobalNet shifted from Florida to London. GlobalNet was acquired

by a London-based investor/shareholder, NewMedia SPARK, in a tender offer that was finally completed in the fall of 2001.

separate claims made against GlobalNet on the grounds that the policies were cancelled for nonpayment of premium. Moreover, National Union informed GlobalNet that it was not interested in reinstating the D & O policies due to "activity on the account."

On January 31, 2003, GlobalNet commenced the diversity action giving rise to this appeal by filing its Complaint. GlobalNet alleged that Crystal breached its contractual and fiduciary duties as its insurance broker and was negligent in the performance of its services. These claims stemmed from Crystal's failure to notify GlobalNet that its D & O insurance policies were to be cancelled for failure to make timely premium payments. GlobalNet also named AICCO as a defendant in this action, asserting claims for breach of contract; however, AICCO is no longer a party to the action.[2]

On February 4, 2004, after the completion of discovery, Crystal moved for summary judgment. GlobalNet cross-moved for partial summary judgment on March 4, 2004. Both motions were heard and marked fully submitted on March 24, 2004. On July 23, 2004, the District Court issued an Opinion and Order granting Crystal's motion for summary judgment and denying GlobalNet's cross-motion for partial summary judgment. The District Court applied the choice-of-law rules of New York, which was the forum state. The District Court first determined, under a grouping-of-contacts test for determining choice of law, that GlobalNet's contract claims against Crystal were governed by New York law because the insurance policies were executed, issued, and brokered in New York State. Next, the District Court found that GlobalNet's tort claims

against Crystal were governed by New York law under an interest-analysis test. Under that test, the District Court determined that GlobalNet's tort claims were based on a failure to act—a tort of omission implicating the regulation of a broker's conduct—in New York, Crystal's principal business location. Applying New York law, the District Court determined that Crystal was entitled to judgment as a matter of law, assuming without deciding that an insurance broker owes a duty to the insured to notify it of an imminent or recent cancellation, because the broker's liability does not extend to circumstances in which the insured knew or should have known of the cancelled coverage.

GlobalNet filed a timely notice of appeal on December 21, 2004. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ANALYSIS

### I. Standard of Review

A district court's grant of summary judgment is reviewed de novo. Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir.1999). This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505,

---

**2.** Pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure, GlobalNet and AICCO agreed to dismiss the action with prejudice as against AICCO and without costs to either party. A stipulation and order to that effect was entered November 30, 2004.

91 L.Ed.2d 202 (1986); *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). However, with respect to a properly supported summary judgment motion, the party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## II. *Choice of Law*

GlobalNet alleged three causes of action against Crystal: professional negligence, breach of fiduciary duty, and breach of contract, all arising from Crystal's alleged failure to notify GlobalNet of AICCO's mailing of the Notice of Intent to Cancel and the Cancellation Notice to GlobalNet for nonpayment of premium. GlobalNet posits that Florida law should apply to its claims. Crystal argues that New York law should apply.

■ A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Gilbert v. Seton Hall Univ.,* 332 F.3d 105, 109 (2d Cir.2003). Here, the forum state is New York, as the action was properly venued in the United States District Court for the Southern District of New York. Neither party disputes that New York's choice-of-law rules apply. The New York Court of Appeals has held that "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co., (Stolarz),* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993); *see also Zurich Ins. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994).

■ There is an actual conflict between the laws of New York and Florida concerning these claims. Under Florida law, an insurance broker [3] generally undertakes a fiduciary relationship with an insured and may be held liable under theories of contract and tort for violations of this fiduciary duty. *See Almerico v. RLI Ins. Co.,* 716 So.2d 774, 776 (Fla.1998) ("As a general principle, an insurance broker is an agent of the insured."); *see also Nu-Air Mfg. Co. v. Frank B. Hall & Co. of New York,* 822 F.2d 987, 997 (11th Cir. 1987) ("When a broker agrees to obtain insurance for a client, the broker becomes the client's agent. As agent, the broker owes his client a duty of care and a duty to exercise the skill he holds himself out as

---

3. Florida law distinguishes "insurance brokers" from "insurance agents":

> An "insurance broker" is one who acts as middleman between the insured and the insurer, and who solicits insurance from the public under no employment from any special company, and who, upon securing an order, places it with a company selected by the insured, or, in the absence of such a selection, with a company selected by himself; whereas an "insurance agent" is one who represents an insurer under an employment by it. Whether a person acts as a broker or agent is not determined by what he is called but is to be determined from what he does. In other words, his acts determine whether he is an agent or a broker.

*Auto–Owners Ins. Co. v. Yates,* 368 So.2d 634, 636 (Fla.Dist.Ct.App.), *cert. denied,* 378 So.2d 351 (Fla.1979) (other quotation marks omitted) (quoting 3 Ronald A. Anderson, *Couch on Insurance 2d,* § 25:92 (1960)).

having. A breach of these duties may subject the broker to liability in both contract and tort." (citations omitted)); *Moss v. Appel,* 718 So.2d 199, 201 (Fla.Dist.Ct. App.1998) (concluding that a broker was in a continuing fiduciary relationship with the insured). Under New York law, however, a broker is not in a special relationship with an insured and generally owes the insured no more than the common-law duty to procure the insurance coverage that the insured requests. *Murphy v. Kuhn,* 90 N.Y.2d 266, 269–70, 660 N.Y.S.2d 371, 682 N.E.2d 972 (1997).

Under New York law there are two different "choice-of-law analyses, one for contract claims, another for tort claims." *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 395 (2d Cir.2001) (applying New York law), *on remand to* 2002 WL 31082955 (S.D.N.Y.2002), *aff'd,* 69 Fed. Appx 31 (2d Cir.2003). Accordingly, we review each of GlobalNet's claims in turn.

A. Contract Claims

The New York Court of Appeals has held that in contract cases, the "center of gravity" or "grouping of contacts" analysis is to be applied in determining the choice of law. *Stolarz,* 81 N.Y.2d at 226, 597 N.Y.S.2d 904, 613 N.E.2d 936; *see also In re Travelers Indemnity Co. (Levy),* 195 A.D.2d 35, 38–39, 606 N.Y.S.2d 167 (N.Y.App.Div.1993). The "center of gravity" or "grouping of contacts" choice of law theory allows a court to consider a "spectrum of significant contacts." *Stolarz,* 81 N.Y.2d at 225–26, 597 N.Y.S.2d 904, 613 N.E.2d 936. In *Stolarz,* the New York Court of Appeals listed several factors which should be considered in a conflict of law analysis in a contract case. These factors include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties."

*Id.* at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936 (citing *Restatement (Second) of Conflict of Laws,* § 188(2) (1971)).

The District Court found that this action involved a matter of coverage: "... GlobalNet's D & O carrier issued both a reservation of rights letter and a disclaimer to GlobalNet. Therefore, the scope of the insurance coverage is at issue here ...." The District Court, relying primarily on *Avondale Industries, Inc. v. Travelers Indemnity Co.,* 774 F.Supp. 1416, 1423 (S.D.N.Y.1991), and *Olin Corp. v. Ins. Co. of North America,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd,* 966 F.2d 718 (2d Cir. 1992), determined that New York law applied to the contract claims. The District Court, following *Avondale Industries,* reasoned that "[b]ecause the risks covered by Global[N]et's policy are not limited to one state, ... the law of the state where the policies were executed, issued and brokered will be applied to the contract claims."

However, the at-issue contracts in this case are neither the insurance agreements for D & O coverage between GlobalNet and the insurance carriers nor the premium Financing Agreement between GlobalNet and AICCO. Here, the at-issue contract for purposes of a choice-of-law analysis was the brokerage contract between GlobalNet and Crystal. Under that contract, Crystal, as broker, procured and negotiated for the D & O insurance policies on behalf of GlobalNet and arranged the premium Financing Agreement for GlobalNet.

*Avondale* and *Olin* are not applicable to the case at bar because both of those cases involved matters of insurance coverage. *See Avondale Industries,* 774 F.Supp. at 1422–23 (stating that, where the insured's interests include a "wide geographic[al] range," New York courts have applied the law of the state where the policies were

executed, issued and brokered, and where the insured had its principal place of business.); *Olin*, 743 F.Supp. at 1049 (stating that, when insurance contracts are specifically at issue, "New York courts have looked principally to the following factors: the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business"); *Zurich Ins. Co.*, 84 N.Y.2d at 317–18, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (noting that in cases where insurance contracts are at issue, the applicable law is the law of the state of the insured risk). Nonetheless, the choice-of-law analysis remains the "center of gravity" or "grouping of contacts" for claims sounding in breach of contract between a broker and an insured.

■ Here, there is an adequate grouping of contacts to apply New York law to the contractual claims. The policies were brokered in New York by Crystal, which is also a corporation headquartered and licensed to do business in New York. GlobalNet, in contrast, was incorporated in Delaware, with its principal place of business having moved from Florida to London, England. The Financing Agreement between AICCO and GlobalNet was prepared by Crystal and executed in New York. AICCO is also a New York corporation. In the performance of its brokerage responsibilities, Crystal procured the D & O coverage from National Union, whose address on the Schedule of Policies Addendum to the Financing Agreement and on the Notice of Acceptance was listed as a New York City address. We therefore see no reason to disturb the holding of the District Court insofar as it held that New York law applies to GlobalNet's breach of contract claim.

## B. Tort Claim

The New York Court of Appeals has held that "the relevant analytical approach to choice of law in tort actions in New York" is the "[i]nterest analysis." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). The New York Court of Appeals has defined "interest analysis" as requiring that "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Id.* (second and third alterations in *Schultz* ) (quoting *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968)). "Under this formulation, significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort . . . ." *Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679.

■ Under the interest-analysis test, torts are divided into two types, those involving " 'the appropriate standards of conduct, rules of the road, for example' " and those that relate to " 'allocating losses that result from admittedly tortious conduct ... such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.' " *Mascarella v. Brown*, 813 F.Supp. 1015, 1019 (S.D.N.Y.1993) (quoting *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach.*, Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993); *see Northwestern Mut. Life Ins. Co. v. Wender*, 940 F.Supp. 62, 66 (S.D.N.Y.1996). If the conflict involves allocation of losses, the site of the tort is less

important, and the parties' domiciles are more important. *Cooney,* 81 N.Y.2d at 72, 595 N.Y.S.2d 919, 612 N.E.2d 277. Here, GlobalNet's claim of professional negligence goes to Crystal's failure to notify it of the Intent to Cancel Notice and the Cancellation Notice.

GlobalNet claims that its tort claims should be analyzed under the substantive law of Florida because that state has a significant interest in regulating the conduct of brokers who knowingly deal with a Florida-based insured to provide coverage for a risk that was primarily located in Florida. GlobalNet asserts that Crystal's conduct "arose out of a business relationship with a Florida-based company, had an impact in Florida, and had absolutely no impact whatsoever in New York."

The District Court found that "New York has a greater interest than Florida in this litigation involving a tort that occurred [in New York] and in regulating the conduct of brokers, insurance agents, premium finance companies and insurers licensed within the state." The District Court determined that "Crystal's failure to act in notifying Global[N]et" of the impending cancellation involved a tort implicating the regulation of a broker's conduct and that the failure to act occurred in New York. Because, for conduct-regulating torts "the site of the tort is the controlling factor in the choice of law analysis," the District Court applied New York law to GlobalNet's tort claims.

■ The determination of the District Court was correct. Here, Crystal is licensed in New York and maintains its principal place of business in New York. Crystal received the notices at its New York office and received phone calls from AICCO regarding the missed premium payment at that same office. Thus, Crystal's failure to notify GlobalNet of the Notice of Intent to Cancel and the Cancella-

tion Notice was centered in New York. *See Northwestern Mut.,* 940 F.Supp. at 66 (applying the law of the state where the insurance company's refusal to honor a claim took place). Moreover, GlobalNet had already left Florida for London by the time that Crystal's alleged tort had occurred. Accordingly, New York law applies to GlobalNet's tort claim of professional negligence.

### III. *GlobalNet's Claims Against Crystal*

■ Having determined that New York law applies to GlobalNet's claims, we turn to the merits of these claims. The District Court determined that Crystal was entitled to judgment as a matter of law as to GlobalNet's breach of contract claim, breach of fiduciary duty claim, and professional negligence claim. The District Court did not specifically address GlobalNet's claim of breach of contract but granted summary judgment to Crystal on that claim *sub silentio.* As an initial matter, GlobalNet's claim for breach of contract is forfeited. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." *Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998); *see also Feingold v. New York,* 366 F.3d 138, 160 (2d Cir.2004); *LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.,* 308 F.3d 169, 176 n. 8 (2d Cir.2002) ("While we no doubt have the power to address an argument despite its abandonment on appeal, we ordinarily will not do so 'unless manifest injustice otherwise would result.'" (quoting *Anderson v. Branen,* 27 F.3d 29, 30 (2d Cir.1994))). GlobalNet's briefs to this Court do not argue a separate breach of contract claim, as distinguished from breach of fiduciary duty and professional negligence claims. To the extent that GlobalNet relies on an "express ... contractual obligation" to impose a duty upon Crystal to forward or

provide the at-issue notices, the absence of any expression in the Record or argument in the brief precludes such a claim here. To the extent that GlobalNet relies on an "implied contractual obligation" that argument is resolved as part of the fiduciary duty and professional negligence analysis below. In any event, there is no evidence of any contractual duty on the part of Crystal to forward cancellation notices arising from the breach of the premium Financing Agreement.

■ We next turn to GlobalNet's claims of professional negligence and breach of fiduciary duty, which are addressed together, as each claim requires GlobalNet to demonstrate that Crystal owed a continuing duty or obligation to GlobalNet to advise it of the cancellation notices and that such duty was breached. The District Court recognized that under New York law an insurance broker owes no continuing duty to advise or direct its client about *future additional insurance needs, see Murphy*, 90 N.Y.2d at 269–70, 660 N.Y.S.2d 371, 682 N.E.2d 972, but an insurance broker may be liable in negligence for failing to communicate its knowledge of an insurance policy *cancellation* to an insured, *see Kamen Soap Prods. Co., Inc. v. Prusansky & Prusansky, Inc.*, 5 A.D.2d 620, 623, 173 N.Y.S.2d 706, 707–08 (N.Y.App.Div.1958); *Holskin v. Hurwitz*, 211 A.D. 731, 208 N.Y.S. 38 (N.Y.App.Div. 1925). The District Court first determined that *Murphy* was not inconsistent with *Kamen* or *Holskin*. Second, the District Court found that GlobalNet had either actual or constructive knowledge of the information regarding cancellation of its insurance coverage. The District Court, "assum[ed] without deciding that an insurance broker owes a duty to the insured to notify it of an imminent or recent cancellation," but determined that a "broker's liability does not extend to circumstances in which the insured knew or should have known of the cancelled coverage." Accordingly, the District Court determined that GlobalNet could not prevail as a matter of law and granted summary judgment to Crystal.

■ New York generally does not recognize a fiduciary or special relationship between an insurance broker and the insured:

> Generally, the law is reasonably settled on initial principles that insurance agents [in New York] have a common-law duty to obtain requested coverage for their clients within a reasonable time or inform the client of the inability to do so; however, they have no continuing duty to advise, guide or direct a client to obtain *additional coverage*. Notably, no New York court has applied [a] "special relationship" analysis to add such continuing duties to the agent-insured relationship.

*Murphy*, 90 N.Y.2d at 270, 660 N.Y.S.2d 371, 682 N.E.2d 972 (internal citations omitted) (emphasis supplied). In *Murphy*, the court held that "[i]nsurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status. Insureds are in a better position to know their personal assets and abilities to protect themselves more so than general insurance agents or brokers, unless the latter are informed and asked to advise and act." *Id.* at 273, 660 N.Y.S.2d 371, 682 N.E.2d 972 (internal citations omitted). The issue in *Murphy* was whether an insurance agent or broker could be held liable to an insured for failing to advise the insured as to "possible additional insurance coverage needs." *Id.* at 268. *Murphy* is distinguishable from the case at bar in that Crystal is not accused of failing to advise of future insurance needs.

The New York Court of Appeals, in *Chase Scientific Research, Inc. v. NIA Group, Inc.*, 96 N.Y.2d 20, 725 N.Y.S.2d 592, 749 N.E.2d 161 (2001), reaffirmed the rule in *Murphy*, holding that an insurance broker has a common-law duty to obtain requested coverage but *"not a continuing duty to advise, guide or direct a client based on a special relationship of trust and confidence."* *Id.* at 30, 725 N.Y.S.2d 592, 749 N.E.2d 161 (emphasis supplied). *Chase Scientific* held that the New York statute of limitations for professional malpractice suits did not apply to actions brought against insurance brokers by the insured. *Id.* at 30–31, 725 N.Y.S.2d 592, 749 N.E.2d 161. In doing so, however, the court recognized that recovery could be allowed under theories of breach of contract and negligence for a failure to procure adequate insurance coverage. *Id.* Such a failure would arise from the original contract for brokerage services entered into by the insured plaintiffs and the defendant brokers. *Chase Scientific* is therefore also distinguishable from the case at bar because Crystal's failure to inform GlobalNet of the cancellation notices does not implicate its performance in obtaining adequate insurance coverage in accordance with the agreement of the parties.

*Kamen* and *Holskin* are applicable to the case at bar, however, and suggest that a broker may be liable under a theory of negligence for failing to inform an insured client about the cancellation of an insurance policy. In *Kamen*, the Appellate Division explained that where a broker is not the cause of the cancellation of an insurance policy

a recovery based on negligence must necessarily rest on a showing that [the insured] did not know of these cancellations; that [the broker] negligently failed to communicate their knowledge of the cancellations to [the insured]; and

the fact [the insured] did not obtain other insurance was the product of such failure of communication without any concurring negligence by [the insured].

5 A.D.2d at 623, 173 N.Y.S.2d 706. In *Kamen*, the Appellate Division reasoned that the defendant broker could not be held liable for failing to advise the plaintiff insured of the two insurance policy cancellations because the plaintiff insured "had prompt knowledge" of the cancellation of the first insurance policy, and "the record strongly suggests that plaintiff had notice of th[e] cancellation [of the second policy] at or immediately after the time of cancellation." *Id.*

In *Holskin*, the plaintiff insured delivered to the defendant broker a fire insurance policy for the sole purpose of having it amended to reflect a rate reduction. *Holskin*, 211 A.D. at 731, 208 N.Y.S. 38. The insurance company, however, cancelled the policy and notified the broker of the cancellation but did not notify the plaintiff insured. *Id.* at 731–32, 208 N.Y.S. 38. The broker also failed to notify the plaintiff insured of the cancellation. *Id.* At some later point a fire occurred, and the plaintiff made a claim against the cancelled policy, which was denied. *Id.* The Appellate Division noted that the plaintiff had "not only failed to annex a copy of the policy to the complaint, but failed even to allege the terms of the policy" and that it appeared that the insurance policy could have expired "in any event, some time before the fire occurred." *Id.* at 732, 208 N.Y.S. 38. Under those circumstances the court reasoned that the plaintiff insured would not have been able to recover under the policy despite any failure by the broker. *Id.* According to that court

it was [the insured's] duty to inform himself of the expiration date, and to take steps to renew the policy, if he

cared to do so. It was not [the broker's] duty to renew the policy, nor does [the insured] claim that the loss was sustained by reason of [the broker's] failure to obtain a renewal.

[The broker] did not obligate himself to advise [the insured] of the expiration date of the policy nor was it [the broker's] duty, either under the allegations of the complaint or as matter of law, to advise [the insured] that the policy expired at any particular time.

The terms of the policy were always within the knowledge of the [insured], and if he failed to remember that the policy expired at a certain time before the fire, it was his own negligence, and not [the broker's], which prevented [the insured] from renewing his policy.

*Id.* at 732–33, 208 N.Y.S. 38 (citation omitted). Accordingly, the Appellate Division ordered the complaint dismissed. *Id.* at 734, 208 N.Y.S. 38.

GlobalNet is unable to prevail on its claims because Crystal was not the cause of the cancellation of coverage. The Financing Agreement between AICCO and GlobalNet, which Crystal was not a party to, set forth AICCO's right to cancel GlobalNet's coverage for non-payment of premiums in explicit terms. Thus, GlobalNet was fully aware of the monthly payment schedule, its obligations to make the monthly premium payments, and the consequences of its failure to pay the premiums each month in accordance with the Financing Agreement. *See Kamen,* 5 A.D.2d at 623, 173 N.Y.S.2d 706 (negligence on part of insured bars recovery); *Holskin,* 211 A.D. at 732–33, 208 N.Y.S. 38 (same). The Notice of Intent to Cancel and the Cancellation Notice were both sent to GlobalNet at the address that GlobalNet had requested its mail to be sent to, to wit, the Mizner address. That the mail was not forwarded to GlobalNet at its London office was not Crystal's failure. Indeed, the District Court found that GlobalNet's own concession bolsters the proposition that it was negligent in missing the premium payment: "Global[N]et acknowledges that because of the confusion surrounding the completion of the tender offer, Global[N]et 'inadvertently ... missed premium payment' on its D & O coverage." It was GlobalNet's negligence that caused the cancellation of the insurance coverage.

Accordingly, the District Court properly granted summary judgment to Crystal on GlobalNet's claims of professional negligence and breach of fiduciary duty.

## CONCLUSION

In accordance with the foregoing reasons, the judgment of the District Court is affirmed.