HIGHLAND CDO OPPORTUNITY
MASTER FUND, L.P.,
Plaintiff,

v.

CITIBANK, N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, and Citigroup Financial Products Inc., Defendants.

Citibank, N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, and Citigroup Financial Products Inc., Counterclaim Plaintiffs,

v.

Highland CDO Opportunity Master
Fund, L.P., Counterclaim
Defendant,

and

Highland CDO Opportunity Fund GP, L.P., and Highland Capital Management, L.P., Additional Defendants to Counterclaim.

12 Civ. 2827(NRB)

United States District Court,
S.D. New York.

Signed August 31, 2017

Filed 09/01/2017

Jeffrey T. Prudhomme, Katy Sheppard, Kennedy L. Barnes, Kenneth Neil Hickox, Kristen A. Miller Reinsch, Michael P. Aigen, Paul B. Lackey, Ross Anthony Mortillaro, Scott Hershman, Lackey Hershman, LLP, Dallas, TX, Kieran M. Corcoran, Lackey Hershman, LLP, New York, NY, for Plaintiff.

Marshall Howard Fishman, Goodwin Procter, LLP, Elizabeth M. Zito, Robert John McCallum, Freshfields Bruckhaus Deringer LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

### NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE

Before the Court are cross-motions for summary judgment on counterclaim plaintiff Citi's counterclaims and veil piercing claims.[1] Citi seeks to hold counterclaim defendant Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") liable for a $24 million deficit and for indemnification in connection with certain credit default swap agreements. Citi also seeks to hold counterclaim defendants Highland Capital Management, L.P. ("HCM") and Highland CDO Opportunity Fund GP, L.P. ("Highland GP," and together with CDO Fund and HCM, "Highland") jointly and severally liable for any judgment awarded against CDO Fund under various veil piercing theories.

For the reasons stated below we (1) grant Citi's motion seeking to hold CDO Fund liable on Citi's counterclaims; (2) deny Citi's motion seeking to hold HCM jointly and severally liable with CDO Fund; and (3) grant Highland's motion to dismiss HCM.

## BACKGROUND [2]

### I. Overview

This lawsuit arises out of a margin call issued by Citi in December 2008 in connection with certain credit default swap transactions entered into between CDO Fund and Citi. See M & O (ECF No. 150) at 2, 6–8, 28–31. After CDO Fund failed to meet the December 2008 margin call, Citi declared an event of default and seized certain assets that CDO Fund had posted to collateralize the credit default swaps. Id. at 12–22. Citi subsequently auctioned off the collateral. Id. at 23–28.

CDO Fund sued Citi, claiming (1) that Citi breached the agreements governing the credit default swaps because its margin calls were based on valuations that were commercially unreasonable and were made in bad faith and (2) that Citi's subse-

---

1. "Citi" refers to counterclaim plaintiffs Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc.

2. The following facts are undisputed unless noted otherwise. For additional background, the Court refers to its March 21, 2013, Memorandum and Order (ECF No. 28) addressing Citi's motion to dismiss and its March 30, 2016, Memorandum and Order (ECF No. 150) ("M & O") addressing the parties' initial summary judgment motions.

quent auctioning of the collateral violated Article 9 of the UCC. See Compl. (ECF No. 1).

Citi counterclaimed, suing CDO Fund, Highland GP (CDO Fund's general partner), and HCM (CDO Fund's management company). Citi sought to recover a $24 million deficit it claimed that CDO Fund still owed under the agreements governing the credit default swaps and sought indemnification from the counterclaim defendants for all losses and costs that Citi incurred as a result of CDO Fund's breach. See Citi's Am. Countercl. (ECF No. 43).

After discovery, the parties cross-moved for summary judgment. See ECF Nos. 88, 119. In March 2016 we issued a Memorandum and Order (1) denying Highland's motion in its entirety; (2) granting Citi's motion that it did not breach the credit default swap agreements when it seized CDO Fund's collateral in December 2008; (3) granting Citi's motion that its sale of collateral in March 2009 did not violate the UCC; and (4) denying Citi's motion that the December 2008 collateral sale did not violate the UCC, thereby permitting CDO Fund's UCC claim to proceed with respect to that collateral. See M & O (ECF No. 150). Citi did not move on its counterclaims, which sought from the counterclaim defendants the recovery of a $24 million deficit and indemnification for Citi's costs and losses.

In our March 2016 Memorandum & Order, we also noted that the record was incomplete on whether Citi could prevail against HCM under a veil piercing theory. Specifically, we noted that the record was incomplete on (1) the extent of CDO Fund's contacts with its place of incorporation (Bermuda), which is relevant to the choice-of-law analysis for the veil piercing issue, and (2) Citi's contention that it would need to pierce at least one Highland-related entity before reaching HCM. Id. at 67–68.

Accordingly, we permitted limited supplemental discovery and permitted a second round of summary judgment motions on the veil piercing issue. Before us now are the parties' cross-motions for summary judgment on Citi's attempt to hold HCM liable for CDO Fund's obligations. See ECF Nos. 188, 197.

## II. Highland Entities

There are numerous Highland-affiliated companies that are relevant to the present motions. Defendant CDO Fund is the original plaintiff and was the counterparty to Citi's credit default swaps. Compl. (ECF No. 1); Citi's 56.1 (ECF No. 203, Ex. B) ¶ 12. It was a fund structured by HCM to invest in collateralized debt obligations ("CDOs") and collateralized loan obligations ("CLOs"). M & O (ECF No. 150) at 5. It invested principally in CLO equity and mezzanine tranches, the two lowest priority tranches. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 11.

CDO Fund was organized as an exempted limited partnership under Bermuda law. Id. ¶ 10. It had neither its own employees nor office, and instead was managed entirely by HCM out of HCM's Texas office. Id. ¶ 15. James Dondero—HCM's co-founder, president, and "dominant partner," id. ¶ 4; McCallum Decl. (ECF No. 199), Ex. 20 at 18:6—was CDO Fund's principal portfolio manager, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 17.

Todd Travers—an HCM senior partner who ran its "CLOs and separate managed accounts" business unit and who reported to Dondero, McCallum Decl. (ECF No. 199), Ex. 89 at 21:6–24—was CDO Fund's senior portfolio manager, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 28.[3]

---

3. Highland argues that we may not rely on certain deposition testimony from Dondero

CDO Fund had two limited partners known as its "feeder" funds. Highland CDO Opportunity Fund, L.P. was the "on-shore feeder." Highland's 56.1 (ECF No. 189) ¶ 4. It was organized as a limited partnership under Delaware law, id., and was managed by HCM, see Citi's 56.1 (ECF No. 203, Ex. B) ¶ 47.

Highland CDO Opportunity Fund, Ltd. was the "offshore feeder." Highland's 56.1 (ECF No. 189) ¶ 5. It was organized as a corporation under Bermuda law, id., and was also managed by HCM, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 35. It was designed primarily to provide favorable tax treatment for foreign investors in CDO Fund. Highland's 56.1 (ECF No. 189) ¶ 5.

HCM was a special limited partner of the onshore feeder and a voting shareholder of the offshore feeder. Id. ¶ 13. Dondero was a director and president of the offshore feeder, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 34, and the "organizational" limited partner of the onshore feeder, id. ¶ 46. Travers was the senior portfolio manager for the two feeder funds. Id. ¶ 28.

CDO Fund's general partner was defendant Highland GP. Id. ¶ 52. It was organized as a limited partnership under Delaware law. Id. Other than de minimis cash, its sole asset was its partnership interest in CDO Fund. Id. ¶ 53. It had no employees or office, id., and was managed by HCM, id. ¶ 54.

Highland CDO Opportunity Fund GP, L.P.'s general partner was Highland CDO Opportunity GP, LLC. Id. ¶ 57. It was organized as a limited liability company under Delaware law. Id. Its sole member was HCM. Id. ¶ 58. It had no offices or employees of its own, id., and appears to have been managed by HCM. Other than de minimis cash, its sole asset was its partnership interest in Highland GP. Id.

## III. The HFP Notes

A central element of Citi's veil piercing claims involves certain notes issued in September 2008 by Highland Financial Partners, L.P. ("HFP"), a hedge fund established and managed by HCM. Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 60, 63. Travers was HFP's CEO and president, and Dondero was one of its directors. Id. ¶¶ 62.

HFP faced liquidity concerns going back to April 2008. McCallum Decl. (ECF No. 199), Ex. 120 at 110:14–17. In mid–2008, HFP sought to conduct a private placement to raise $200 million so that HFP could "continue operations as normal" under the belief that $100 million would be "inadequate to fully return to normal operations." Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 108, 109. The private offering was completed in July 2008, but only raised approximately $97 million; Highland funds contributed approximately $85 million of

and Travers because it was given in a separate case and therefore Highland did not have an "opportunity and similar motive to develop the testimony." See, e.g., Pl.'s Opp. 56.1 ¶ 4. Highland cites no authority for such a proposition, which appears to be an improper application of the hearsay rule. While certain testimony of unavailable declarants may be inadmissible where the opposing party lacked an opportunity and similar motive to develop the testimony, see Fed. R. Evid. 804(b)(1)(B), that rule is inapplicable here because Dondero and Travers are available to testify. Moreover, their statements are not even hearsay, as

they fall under the exception for opposing party statements. See id. 801(d)(2). Nor is testimony excludable on summary judgment merely because it was taken in a different case. See, e.g., Alexander v. Casino Queen, Inc., 739 F.3d 972, 978 (7th Cir. 2014) ("The weight of authority is that depositions can be the equivalent of affidavits, and are therefore admissible at the summary judgment stage."); Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001); Kovalchik v. City of New York, No. 09-CV-4546(RA), 2014 WL 4652478, at *5 n.5 (S.D.N.Y. Sept. 18, 2014). Accordingly, we will consider the testimony.

the total, including $15 million in cash contributed by CDO Fund. Id. ¶ 110; McCallum Decl. (ECF No. 199), Ex. 98 at CDO00082727.082.

In September 2008, HFP issued $316 million in long term "senior secured notes" backed by CLOs and life settlement contracts (the "HFP Notes"). Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 128, 130; McCallum Decl. (ECF No. 199), Ex. 17. The income received on the assets backing the notes was to be pooled and distributed to note holders on a quarterly basis; however, HFP had the option of satisfying the distributions in cash or in newly-issued notes (the "payment-in-kind" option). Id., Ex. 17 at CITI–HL–00008157.

CDO Fund purchased $47.7 million of the HFP Notes in exchange for $52.8 million in assets and the forgiveness of a $5.1 million prior obligation. Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 131–32.

## IV. Citi's October Margin Call

In the fall of 2008, Citi and CDO Fund were parties to two financing arrangements: (1) a secured loan facility with a maturity date of December 1, 2008 (the "Loan Facility"); and (2) a series of credit default swaps with an aggregate notional value of $59 million. M & O (ECF No. 150) at 6.

Under the credit default swaps agreements, CDO Fund posted initial cash collateral (or margin) based on a percentage of Citi's exposure. Id. at 8. If the value of the posted collateral decreased relative to Citi's exposure, CDO Fund was required to post additional collateral. Id. at 9. Citi's permission was required for CDO Fund to post collateral other than cash and treasury bonds. Id. at 8.

On October 17, 2008, Citi issued a $17.6 million margin call to CDO Fund. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 159. The parties eventually agreed that CDO Fund would satisfy the margin call by pledging its remaining HFP Notes to Citi as collateral, id., with the notes valued at 40% of their $21.4 million face value, or approximately $8.6 million, id. ¶ 168; Highland's Opp. 56.1 (ECF No. 209) ¶ 168; McCallum Decl. (ECF No. 199), Ex. 3 at CITI–HL–00052734.[4]

The agreement was memorialized on November 25, 2008 (the "November 25 Agreement"). As part of the agreement, HCM also guaranteed CDO Fund's obligation to pay Citi the remaining $5 million balance on the Loan Facility and CDO Fund agreed to meet future margin calls in cash. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 167.

The November 25 Agreement also contained a provision addressing the "payment-in-kind" option on the HFP Notes under which HFP had the option to pay quarterly distributions in newly-issued notes rather than in cash. Under the November 25 Agreement, the parties agreed that as long as Citi held any of the HFP Notes under a pledge from CDO Fund,

> if HFP has cash available on a Quarterly Payment Date in an amount equal or greater to the Quarterly Payment Amount, [HCM] will recommend to the board of directors and management of HFP, to the extent consistent with HCM's fiduciary duties, that HFP not exercise the [payment-in-kind] Option on the Notes for such Quarterly Payment Date.

Citi's 56.1 (ECF No. 203, Ex. B) ¶ 167; Highland's Opp. 56.1 (ECF No. 209) ¶ 167.

---

4. Of the $47.7 million in HFP Notes originally received, CDO Fund sold $4 million to an HCM affiliate for cash, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 147, and transferred $22.3 million to HCM in satisfaction of prior loans, id. ¶ 150.

## V. Citi's December 2008 Margin Call

On December 12, 2008, Citi issued another margin call for $20 million. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 93. CDO Fund did not meet the call.

The parties subsequently discussed possible options by which CDO Fund could meet the December margin call, see, e.g., id. ¶ 97, including a "standstill" agreement under which CDO Fund would post additional collateral to satisfy its obligations under the margin call, id. ¶ 99. Citi emailed HCM a draft of the agreement on December 22, 2008, stating, "Guys, we need to get this done by tomorrow at the latest. We also need the collateral transferred asap." Id. ¶ 100.

Two days later, on December 24, 2008, HCM informed Citi by email that it would not be able to reach an agreement; HCM explained that, in light of Moody's and S & P downgrading certain CLOs, "the terms and conditions contained in your recent proposal are no longer practical for [HCM] and [CDO Fund]. Although the previously contemplated solutions involving additional monies or guarantees are not possible we would like to explore terming out the financing by posting additional collateral." McCallum Decl. (ECF No. 199), Ex. 86.

Later that day, Citi declared an event of default under the credit default swap agreements and foreclosed on CDO Fund's collateral for failure to meet the December margin call. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 106.

## VI. Unwinding of the HFP Notes

In March 2009 the HFP Notes were unwound, with Citi surrendering its HFP Notes in exchange for certain assets that served as collateral on the notes. Highland's 56.1 (ECF No. 189) ¶¶ 60–61. As part of the unwinding of the notes, Citi also agreed to release all claims related to the HFP Notes. Id. ¶¶ 61–63.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). A genuine dispute exists if a reasonable factfinder could decide in the nonmoving party's favor. Id.

A court must resolve all ambiguities and draw all justifiable factual inferences in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must "make a prima facie showing that it is entitled to summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party puts forth such a showing, then there is no issue for trial unless the party opposing summary judgment presents "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Liberty Lobby, 477 U.S. at 249, 106 S.Ct. 2505.

### II. HCM Is Not Liable on Citi's Counterclaims [5]

Citi advances various theories under which it seeks to hold HCM liable for any

---

5. Although Citi's motion seeks to hold both HCM and Highland GP jointly and severally liable, there is no dispute that counterclaim defendant Highland GP is liable for CDO Fund's obligations under ordinary partnership law. See Highland MSJ (ECF No. 190) at 8 n.22 ("Everyone agrees that Citi can seek to recover CDO Fund's debts or liabilities from

judgment awarded against CDO Fund: (1) HCM is liable under a traditional veil piercing theory; (2) HCM is liable as the "equitable" owner of CDO Fund; (3) HCM is liable as CDO Fund's "de facto" general partner; and (4) HCM is liable as CDO Fund's "de facto" limited partner.

However, before we reach these theories, we must address the law that governs Citi's veil piercing claims.

## A. Choice of Law Governing Veil Piercing Claims

The parties agree that even though CDO Fund is organized in Bermuda, Bermuda law should not apply because CDO Fund had no meaningful connections with that jurisdiction. See Highland's MSJ (ECF No. 190) at 5; Citi's MSJ (ECF No. 201) at 10.[6] Instead, Highland argues that Texas law applies, while Citi argues for New York law.

■ Under New York's choice-of-law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006) (quoting In re Allstate Ins. Co., 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)).

■ A conflict exists here. To pierce a corporate veil under Texas law, a plaintiff must establish an "actual fraud," whereas he need only establish a fraud or wrong

CDO Fund's General Partner, Highland GP, which Citi appropriately named in its counterclaims, in accordance with the law governing limited partnerships.").

**6.** As used herein, "MSJ" refers to the parties' respective memoranda of law in support of their motions for summary judgment and "56.1" refers to the parties' statements of undisputed fact pursuant to local rule 56.1.

under New York law. Compare Ocram, Inc. v. Bartosh, 01–11–00793–CV, 2012 WL 4740859, at *2 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.) (finding that Texas statute permits "the use of alter ego or other similar theory, to impose liability on a holder 'if the obligee demonstrates that the holder ... caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder'" (citing Tex. Bus. Orgs. Code Am. § 21.223(b))), with JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F.Supp.2d 461, 476 (S.D.N.Y. 2005) ("[P]laintiff is not required to demonstrate fraud for the Court to pierce the corporate veil; under New York law, the plaintiff must show that the alleged dominator's 'domination was used to commit a *fraud or wrong* against the plaintiff which resulted in the plaintiff's injury.'" (quoting Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160–61 (1993)).

Having found that a conflict exists, the next step is to apply New York's "interest analysis" test.[7] New York's interest analysis "is a flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48–49 (2d Cir. 2013) (internal quotation marks omitted).

**7.** New York applies a separate choice-of-law rule for contract claims—the "center of gravity" or "grouping of contacts" analysis. See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 383 (2d Cir. 2006). Neither party contends that such rule applies to Citi's veil piercing claims.

The test is applied differently depending on whether the rules in question are "conduct-regulating," *i.e.*, "rules that people use as a guide to governing their primary conduct," or "loss-allocating," *i.e.*, "rules that prohibit, assign, or limit liability after the tort occurs." Id. at 49 (internal quotation marks omitted).

■ When "conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." GlobalNet Financial.Com, Inc., 449 F.3d at 384–85 (internal quotation marks omitted). "If the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important." Id.

■ As an initial matter, it is not entirely clear whether veil piercing is a conduct- or loss-regulating rule, something neither party addresses and which other courts do not appear to have addressed. We find that veil piercing is best treated as a species of fraud or similar tort and therefore is a conduct-regulating rule. Accordingly, the place where the veil piercing "occurred" is the most important factor under the interest analysis test. Under New York law, "[a] tort occurs in the place where the injury was inflicted, which is generally where the plaintiffs are located." Lyman Commerce Sols., Inc. v. Lung, No. 12-CV-4398, 2013 WL 4734898, at *4 (S.D.N.Y. Aug. 30, 2013); see also Cromer Fin. Ltd. v. Berger, 137 F.Supp.2d 452, 492 (S.D.N.Y. 2001) ("[F]or claims based on fraud, a court's 'paramount' concern is the locus of the fraud, that is, the place where the injury was inflicted, as opposed to the place where the fraudulent act originated." (internal quotation marks omitted)).

■ Applying the above rules, we find that New York has the greatest interest in applying its law to the veil piercing claims at issue here. Three of the four Citi counterclaim plaintiffs have their principal places of business in New York, including Citibank, N.A., who was the counterparty to the credit default swap agreements giving rise to the counterclaims. M & O (ECF No. 150) at 7–8 & n.2.[8] Accordingly, the relevant injury here occurred in New York. Moreover, various agreements relevant to Citi's claims are governed by New York law, including the underlying credit default swap agreements, the agreement under which the HFP Notes were issued, and the November 25 Agreement between CDO Fund and Citi. Id. at 8. Thus, New York has a significant interest in ensuring that parties who contract under New York law cannot escape liability to a New York counterparty by abusing the corporate form. See, e.g., UBS Sec. LLC v. Highland Capital Mgmt., L.P., 30 Misc.3d 1230(A), 924 N.Y.S.2d 312 (Sup. Ct. N.Y. Cty. Mar. 1, 2011) (finding New York law applied to veil piercing claims against [Highland affiliate] SOHC where "contracts between SOHC and UBS at issue … were negotiated through counsel in New York and, by their terms, are governed by the law of New York"), aff'd in part, modified in part, 93 A.D.3d 489, 940 N.Y.S.2d 74 (1st Dep't 2012).

---

**8.** Citibank, N.A. is a national banking association, organized under the laws of the United States, and has its principal place of business in New York City and its head office in South Dakota. Citigroup Global Markets Inc. is incorporated in New York and has its principal place of business in New York. Citigroup Financial Products Inc. is incorporated in Delaware and has its principal place of business in New York. Citigroup Global Markets Limited is organized in England and has it principal place of business in London. Citi's Am. Countercl. (ECF No. 43) ¶¶ 8–11.

Texas's interests, in contrast, are significantly more limited. While the parties agree that HCM managed CDO Fund from its office in Dallas, Texas, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 15, HCM is incorporated in Delaware, not Texas, id. ¶ 1, and there is no injury that is claimed to have occurred in Texas, cf. Highland MSJ (ECF No. 190) at 6–7. Thus, the only interest that Texas has in this litigation is regulating the conduct of a foreign company doing business within Texas when the conduct injures parties outside of Texas. That does not outweigh New York's significant interests in the litigation.

Accordingly, we find that New York's law applies to Citi's attempt to pierce CDO Fund's veil.

## B. HCM Is Not Liable Under a Veil Piercing Theory

Citi first argues that HCM can be held liable under a traditional veil piercing theory.

■ As an initial matter, Highland argues that veil piercing is inapplicable in the context of a limited partnership because a general partner is always liable for the partnership's obligations to third parties. Whatever the merits of that argument, we need not reach it here because we find that Citi has not established the elements of a veil piercing claim regardless of whether the doctrine is applicable to limited partnerships.

■ To pierce the corporate veil under New York law, a plaintiff must establish (1) "that the owner exercised complete domination over the corporation with respect to the transaction at issue" and (2) "that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Thrift Drug, Inc. v. Universal Prescription Adm'rs, 131

F.3d 95, 97 (2d Cir. 1997) (internal quotation marks omitted).

### 1. Domination

The Second Circuit has identified ten factors to consider in determining whether an entity exercises complete domination over another:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991).

We have no difficulty finding that HCM exercised complete control over CDO Fund based on the following facts, which we find to be undisputed:

- CDO Fund did not have its own offices or employees; its operations were managed entirely by HCM personnel. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 15.
- HCM managed CDO Fund pursuant to an investment manager agreement

that required HCM's principals to "provide full-time investment management services to [CDO Fund]" and "direct the investment decisions of [CDO Fund]" either directly or indirectly through HCM. Highland's 56.1 (ECF No. 189) ¶ 43.

- HCM and its personnel also managed both of CDO Fund's feeder funds, CDO Fund's general partner, and that entities general partner. Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 35, 47, 54. None of those entities had their own offices (with the exception of the offshore feeder) or employees. Id. ¶¶ 36, 51, 53, 58.

- Through a web of intermediaries, HCM and its personnel held direct ownership interests in every CDO Fund-related entity: HCM was (1) a limited partner of CDO Fund's general partner, Highland's 56.1 (ECF No. 189) ¶ 15; (2) the sole owner of that entity's general partner (Highland CDO Opportunity GP, LLC), Citi's 56.1 (ECF No. 203, Ex. B) ¶ 58; (3) a special limited partner of the onshore feeder, id., ¶ 46; and (4) the sole voting shareholder of the offshore feeder, id. ¶ 34.

- James Dondero—HCM's co-founder, president, and "dominant partner," id. ¶ 4; McCallum Decl. (ECF No. 199), Ex. 20 at 18:6—was (1) the principal portfolio manager to CDO Fund, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 17; (2) a director and president of the offshore feeder, id. ¶ 34; and (3) the "organizational" limited partner of the onshore feeder, id. ¶ 46.

- As a result of HCM's and Dondero's management and ownership roles, Dondero was the sole signatory to CDO Fund's Articles of Limited Partnership, executing it on behalf of the fund's general partner and the fund's two limited partners. See McCallum Decl. (ECF No. 199), Ex. 29. Similarly, Dondero was the sole signatory to the investment management agreement between HCM and CDO Fund. See id., Ex. 32.

- Dondero testified that he never lost "controlling authority over [CDO Fund's] general partner, the limited partner, or the fund itself as a result of the addition of new investors." Id., Ex. 20 at 160:22–161:2.

- Todd Travers—an HCM senior partner who ran its "CLOs and separate managed accounts" business unit and who reported to Dondero, id., Ex. 89 at 21:6–24—was also the senior portfolio manager for CDO Fund and the two feeder funds, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 28. He testified that he "viewed the domestic feeder and the offshore feeder and the master fund as one master fund." McCallum Decl. (ECF No. 199), Ex. 89 at 37:21–38:11.

- CDO Fund did not produce audited financial results for 2008 (although it did for 2007). Citi's 56.1 (ECF No. 203, Ex. B) ¶ 26; Highland's MSJ (ECF No. 190) at 14. Highland claims they were not produced because by April 2009, which is when they would have been prepared, the fund was being wound down. See Highland's Opp. MSJ (ECF No. 208) at 14.

- After September 30, 2008, HCM ceased to keep a capital roll record on behalf of CDO Fund and the feeder funds because "it was no longer worth expending the moneys" to do so. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 32.

- Funds were often transferred directly from HCM to CDO Fund without

passing through the feeder funds. See McCallum Decl. (ECF No. 199), Ex. 47.

- HCM repeatedly moved cash between itself and the various funds it managed, including CDO Fund, in order to provide liquidity during late 2008. Among other things, and as discussed further below, (1) HCM extended multiple cash loans to CDO Fund, see Highland's Opp. MSJ (ECF No. 208) at 14; Citi's Opp. 56.1 ¶ 37; McCallum Decl. (ECF No. 199), Exs. 44, 46, 48, 49, 50; (2) HCM had an affiliate cover a $5.1 million margin call on CDO Fund's behalf, see infra at 729; and (3) HCM drew on a personal loan from one of its principals, Mark Okada, to provide liquidity to CDO Fund, Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 82, 90.

- Travers testified that when CDO Fund invested $15 million in HFP in July 2008, he did not "think it was a decision based on a particular fund," but rather it was "a global decision to help HCM and all of its affiliates as a combined entity." McCallum Decl. (ECF No. 199), Ex. 120 at 157:4–14.

- CDO Fund's purchase of the HFP Notes in September 2008 was not an arm's length transaction. The notes were illiquid securities and were only ever purchased by and traded among HCM-managed funds. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 140. Travers testified that no "one ever obtained a true analysis of the transaction to confirm that it really did represent what an arm's-length transaction would have looked like" and that he did not "think an arm's-length transaction like that could have happened in that time frame." McCallum Decl. (ECF No. 199), Ex. 120 at 213:5–18. Travers also testified that it was "[p]robably not" "a prudent investment [for CDO Fund] to loan money to HFP at that time" as compared to "doing just about anything else with its available cash or resources." Id. at 218:19–24. In addition, Dondero testified that by September 2008 HFP "wouldn't have been able to get any financing under any terms." Id., Ex. 20 at 418:13–14.[9]

We find the above facts are sufficient to find that, as a matter of law, HCM dominated CDO Fund for purposes of the veil piercing analysis.

---

9. Highland claims that the transaction was arm's length, but does not offer evidence sufficient to rebut the above testimony. For example, Highland claims that the transaction was approved by CDO Fund's independent committee. Highland's 56.1 ¶ 48. However, the committee does not appear to have been truly independent. Among other things, the same two members who comprised CDO Fund's independent committee also comprised the independent committees for the three other Highland funds that contributed to the HFP Notes. See Leventon Decl. (ECF No. 191), Ex. A–23. Moreover, those two individuals gave their approval on behalf of all four contributing funds collectively, id., belying the notion that the committees acted independently. Finally, one of the two independent committee members, Charles McQueary, testified that he was not even "familiar with the entity Highland CDO Master Fund, LP." McCallum Decl. (ECF No. 199), Ex. 87 at 24:19–21. Rather, he believed that he served on HCM's valuation committee and was approving the pricing and value of instruments underlying certain transactions rather than the transactions themselves. Id. at 30:24–31:7. Highland's other evidence that the HFP Note transaction was arm's length—testimony from Citi's corporate representative that he did not believe that "Citi specifically is claiming that [the HFP Note Transaction] ... was not an arm's length transaction," Prudhomme Decl. (ECF No. 192), Ex. B–27 at 65:5–11—is also insufficient.

## 2. Wrong or Fraud

Nevertheless, we find that Citi has not established that HCM used its domination of CDO Fund to perpetuate a fraud or wrong on Citi. Citi identifies three acts which it asserts constitute fraudulent or wrongful conduct: (1) HCM stripped cash and assets from CDO Fund prior to Citi's December margin call; (2) HCM diverted cash distributions on the HFP Notes that would otherwise have been available to CDO Fund to satisfy Citi's margin call; and (3) HCM fraudulently represented the value of the HFP Notes. We consider each in turn.

### a. Asset Stripping

Citi claims that in December 2008 HCM stripped CDO Fund of cash and assets that would have otherwise been available to satisfy Citi's $20 million December margin call.

Citi first identifies a transfer of $2.2 million in cash on December 15, 2008, from CDO Fund to Highland CLO Value Fund, a Highland affiliate that was managed by HCM and had no employees or offices of its own. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 83; Highland's Opp. 56.1 (ECF No. 209) ¶ 83. However, the record shows that the transfer was a partial return of $3.5 million in cash that Highland CLO Value Fund had transferred to CDO Fund on December 2, 2008, just two weeks earlier. See McCallum Decl. (ECF No. 199), Ex. 47 (CDO Fund's cash flow spreadsheet recording the December 2, 2008, transfer as a "Transfer ... for Pre–Funding of Trades" and recording December 15, 2008, transfer as "Return of Overpayment on Pre–Funded Trades"); McCallum Decl. (ECF No. 199), Ex. 65 (December 15, 2008, HCM email explaining that "[e]mbedded in [the initial transfer of] $3.5mm is the $2.241mm that needs to be returned to CLO Value Fund from CDO Fund. The $2.241mm represents a prefunded pay-ment for bonds that were traded to RBS instead of CLO Value. CDO Fund must return the [$2.241mm in] cash since CLO Value did not receive the funds.").

Citi next identifies $8.1 million in assets transferred out of CDO Fund around December 22, 2008. Of the total, CDO transferred $5.1 million in assets to Highland Special Opportunities Holding Company ("SOHC"), Citi's 56.1 (ECF No. 203, Ex. B) ¶ 103, a wholly-owned subsidiary of HFP, id. ¶ 68. As above, however, the record shows that the asset transfer was to satisfy a preexisting obligation that CDO Fund owed SOHC. Specifically, SOHC had previously satisfied CDO Fund's obligation to cover 51% of a $10 million margin call (or $5.1 million) made by UBS on a separate loan facility. See McCallum Decl. (ECF No. 199), Ex. 71; id., Ex. 115 (December 16, 2008, HCM email explaining that "[a]s presented in the 11/18/2008 board meeting materials, SOHC posted assets totaling $10mm market value on October 24th to satisfy a margin call on the UBS facility. The assets listed below represent CDO Fund's repayment of their share of that margin call, $5.1mm.").

The $8.1 million also consisted of $3 million in assets transferred from CDO Fund to HCM. Citi's 56.1 (ECF No. 203, Ex. B) ¶ 103. Again, however, the transfer was to satisfy a preexisting obligation owed by CDO Fund, namely a $3 million cash loan from HCM to CDO Fund made around October 24, 2008. See McCallum Decl. (ECF No. 199), Ex. 71 at CDO00081174 (noting that the transfer was "as payment for a loan provided by [HCM] to CDO Fund"); id., Ex. 47 (CDO Fund's master cash flow spreadsheet recording a $3 million cash transfer from HCM to CDO Fund on October 24, 2008, as a "Loan from HCMLP"); Leventon Decl. (ECF No. 191), Ex. A–22 ($3 million promissory note from CDO Fund to HCM

dated October 24, 2008); Oral Arg. Tr. at 37:5–22 (stating that asset transfer was to repay $3 million promissory note dated October 24, 2008).[10]

Citi next argues that even if the transfers to HCM and its affiliates were to satisfy preexisting obligations, they still constitute a wrong for veil piercing purposes because CDO Fund was insolvent or near insolvency at the time of the transfers and therefore owed a fiduciary duty to its general creditors not to self-deal. Citi claims that CDO Fund's repayment of loans to HCM and HCM affiliates violated this duty. Citi Opp. MSJ (ECF No. 213) at 4.

Putting aside factual questions of whether and when CDO Fund was insolvent or in the "zone of insolvency," we find Citi's argument unpersuasive for several reasons. First, despite giving Citi the opportunity to submit supplemental briefing on the issue, Citi cites no authority applying its fiduciary duty theory in the veil piercing context. Rather, the cases that Citi cites in support are all in the bankruptcy context, see In re Kingston Square Assocs., 214 B.R. 713, 735 (Bankr. S.D.N.Y. 1997); In re Hampton Hotel Inv'rs, L.P., 270 B.R. 346, 361 (Bankr. S.D.N.Y. 2001), which have limited applicability here.

In contrast, there is case law—specifically in the context of fraudulent conveyances—finding that similar transfers *do not* constitute a wrong for veil piercing purposes. New York law distinguishes between actual and constructive fraudulent conveyances, the former requiring intent "to hinder, delay, or defraud either present or future creditors." Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 126 F.Supp.3d 388, 401 (S.D.N.Y. 2015) (citing N.Y. Debt. & Cred. Law § 276), reconsid-

eration denied, No. 13-CV-6437 (KMW), 2016 WL 4290525 (S.D.N.Y. Aug. 11, 2016). In contrast, "[c]onstructively fraudulent conveyances under [New York law] are defined exclusively by the objective conditions of the asset transfer at issue, without regard to the debtor's intent in making the transfer." Id. at 400.

However, New York courts have rejected the argument that constructive fraudulent transfers, even when made to a company's owners, constitute a *per se* wrong for veil purpose-piercing purposes:

> [E]ven if a constructively fraudulent transfer has the *effect* of removing assets that could have been used to satisfy a corporation's obligations to other creditors, the transfer may not have been made with a deceitful or unjust *purpose*. Absent persuasive evidence of a culpable motive, therefore, a claim that is successful under [New York's constructive fraudulent conveyance statute] may not establish wrongdoing sufficient to justify veil-piercing.

Id., at 405.

Here, the only evidence that Citi offers in support of an unjust motive is an email from December 22, 2008, in which HCM says that the $8.1 million asset transfer "MUST SETTLE NO LATER THAN TOMORROW." McCallum Decl. (ECF No. 199), Ex. 71 at CD0000881169. Citi argues that this email is evidence that HCM was attempting to strip the assets from CDO Fund in advance of the "standstill" agreement, which fell through sometime in the next two days. However, the significance of the email is ambiguous, at best, and must be considered against the fact that the loans that were being repaid provided CDO Fund with much-needed li-

---

**10.** "Oral Arg. Tr." refers to the transcript of the oral argument held before the Court on

the present motions on August 17, 2017.

quidity in late-October and November 2008, which in turn redounded to Citi's benefit.[11] Thus, we find the evidence is insufficient to establish that HCM transferred the assets in question with the intent to defraud Citi.

### b. Diversion of HFP Note Cash Distributions

In addition to asset stripping, Citi alleges two wrongs related to the HFP Notes. Under the first theory, Citi claims that HCM diverted certain cash received on the underlying HFP Note assets, thereby preventing Citi from receiving the cash as a note holder. Specifically, Citi claims that HFP received at least $10 million in cash proceeds on the assets underlying the HFP notes, but used the cash "to make required payments on other short term financing facilities" and also diverted cash from HFP to HCM and Dondero.[12]

As Citi concedes, it was not contractually entitled to receive cash distributions on the HFP Notes because HFP had the option of paying distributions in kind, *i.e.*,

by issuing new notes. Nevertheless, Citi argues that HCM had an implied good faith obligation under the November 25 Agreement to ensure that cash was available for distribution on the notes. Citi's Opp. MSJ (ECF No. 213) at 5. Citi bases this good faith obligation on the provision in the November 25 Agreement under which the parties agreed that as long as Citi held any of the HFP Notes,

> if HFP has cash available on a Quarterly Payment Date in an amount equal or greater to the Quarterly Payment Amount, [HCM] *will recommend* to the board of directors and management of HFP, to the extent consistent with HCM's fiduciary duties, that HFP not exercise the [payment-in-kind option] on the Notes for such Quarterly Payment Date.

Highland's Opp. 56.1 (ECF No. 209) ¶ 167 (emphasis added).

Again we find several flaws with Citi's argument. First, the conduct that Citi identifies—transferring cash from HFP to

11. As noted above, the $8.1 million in asset transfers were to repay two obligations incurred by CDO Fund on October 24, 2008, namely SOHC's covering of a $5.1 million margin call by UBS and HCM's loan of $3 million in cash. That same day, CDO Fund satisfied a $3 million margin call to Bank of America, which resulted in CDO Fund having a temporary negative cash balance. McCallum Decl. (ECF No. 199), Ex. 47. Without the loans, CDO Fund would have had an end-of-the-day cash balance on October 24, 2008, of *negative $6.4 million*. See id. (CDO Fund's master cash flow spreadsheet showing end-of-the-day balance of $1.7 million for October 24, 2008, after inflow of $3 million cash from HCM).

12. The record shows that on November 4, 2008, one of the special purpose entities established to hold the assets underlying the HFP Notes received $10.8 million in cash, McCallum Decl. (ECF No. 199), Ex. 136. HCM emails dated November 5, 2008, and November 6, 2008, suggest that the cash was

distributed to HCM, including to satisfy a margin call on HFP. See Ex. McCallum Decl. (ECF No. 199), 60; id., Ex. 136. Moreover, on January 29, 2009, HCM informed Citi that $9.3 million in cash that had been received on the assets underlying the HFP Notes had been used for "other purposes," "[p]rimarily to make required payments on other short term financing facilities." Citi's 56.1 (ECF No. 203, Ex. B) ¶¶ 189–90, 193. HCM does not explain what those "short term financing facilities" were. Citi also points to evidence showing that HFP (1) transferred $8 million cash to HCM on November 5, 2008, id. ¶ 166; (2) transferred $3.7 million in cash to Dondero's personal bank account on December 10, 2008, id. ¶¶ 170–71; and (3) at least intended (although it is not clear if HCM succeeded) to transfer $1.9 million to Dondero's personal bank account on February 2, 2009, id. ¶ 195. However, it is not clear whether the cash transferred to HCM and Dondero is related to the cash HFP received on the HFP Note assets.

HCM and Dondero and thereby breaching an obligation that HCM owed *directly to Citi*—had nothing to do with CDO Fund and therefore cannot form the basis for piercing CDO Fund's veil. In other words, the conduct is not an example of HCM's dominance of CDO Fund where the "domination was used to commit a fraud or wrong that injured" Citi. Thrift Drug, 131 F.3d at 97.

■ Second, we are unpersuaded that HCM even owed Citi a good faith obligation to ensure that cash was available for distribution on the HFP Notes. "In general, courts enforce the implied covenant where an implied promise was so interwoven in the whole writing of a contract as to be necessary for effectuation of the purposes of the contract." M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (internal quotation marks omitted). However, "the implied covenant arises only in connection with the rights or obligations set forth in the terms of the contract, and cannot create duties that negate explicit rights under a contract." In re Libor–Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 NRB, 2015 WL 4634541, at *67 (S.D.N.Y. Aug. 4, 2015) (internal quotation marks omitted), amended, No. 11 MDL 2262, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015).

Given that the November 25 Agreement only required that HCM "recommend" to HFP that it make distributions in cash rather than in kind, and given that HFP had no obligation to follow the recommen-

dation or even make distributions in cash, it makes little sense to read into the November 25 Agreement an implied promise that HCM would ensure that cash was available for distribution on the HFP Notes. To the contrary, such an implied promise would impose a duty on HCM beyond that which Citi bargained for.

■ Finally, it is unclear whether a breach of an implied obligation of good faith even constitutes a wrong for purposes of veil piercing. Citi cites no authority for that position. In contrast, it is well-established that an ordinary "breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil." Am. Federated Title Corp., 126 F.Supp.3d at 403 (internal quotation marks omitted). Further, a "breach of an implied covenant of good faith and fair dealing does not provide a [distinct] cause of action … from a breach of contract claim," but "is merely a breach of the underlying contract." Designers N. Carpet, Inc. v. Mohawk Indus., Inc., 153 F.Supp.2d 193, 197 (E.D.N.Y. 2001).[13]

### c.  *Valuation of the HFP Notes*

Finally, Citi alleges that HCM fraudulently represented the value of the HFP Notes that CDO Fund pledged to Citi as collateral under the November 25 Agreement because HCM knew the notes were "worthless." Under the agreement, the notes were valued at 40% of face value, or approximately $8.6 million.[14]

---

**13.** We note two other issues with Citi's theory. First it is speculative, in that the first quarterly distribution on the HFP Notes was not due until February 15, 2009, by which time the notes were being unwound. As a result, Citi cannot say that HCM made certain that no cash would be available for distribution on the HFP Notes. Second, Citi released any claims against HFP and HCM relating to the HFP Notes when they were unwound. As

a result, we doubt that Citi should be allowed to claim, as a matter of equity, that HCM's otherwise released conduct constitutes a wrong for veil piercing purposes.

**14.** Citi claims that it did not have the ability to value the life insurance contracts underlying the HFP Notes and therefore relied on HCM's representations regarding the HFP Notes' value. See Citi's 56.1 (ECF No. 203,

Citi's claim fails because Citi presents no evidence suggesting that HCM believed the notes were overvalued. Rather, the evidence that Citi relies on in support of its claim—that on November 7, 2008, HCM instructed its valuation firm to value HFP's equity at $250 million, Citi's 56.1 (ECF No. 203, Ex. B) ¶ 144, but revised that figure down to $3.6 million on November 20, 2008, id. ¶¶ 145–46; that HFP's estimated liability on a loan facility as of November 20, 2008, was $160 million, id. ¶ 155; and that HFP's book value had fallen to $0 by the end of November, id. ¶ 188—only suggests that *HFP* was insolvent. However, HFP's financial condition is irrelevant to the value of the HFP Notes because the notes were secured by independently valued collateral. Highland's Opp. MSJ (ECF No. 208) at 21; McCallum Decl. (ECF No. 199) Ex. 135.

In response, Citi argues that HCM (1) failed to secure the HFP Note collateral as it was required to do; (2) disposed of unsecured collateral in January 2009, and (3) decided to unwind the HFP Notes on December 29, 2008, because of "serious doubt" about HFP's ability to service the debt on the HFP Notes. Citi Opp. MSJ (ECF No. 213) at 6. Even if true, though, none of those facts suggests that HCM believed the HFP Notes were overvalued when they were pledged to Citi as collateral in November 2008.

Accordingly, Citi's claim that HCM fraudulently represented the value of the HFP Notes fails as a matter of law.

\* \* \*

Because none of the acts identified by Citi constitutes a wrong or fraud for veil piercing purposes, HCM is not liable for CDO Fund's obligations under a traditional veil piercing theory.

Ex. B) ¶ 169. Highland disputes this claim.

## C. HCM Is Not Liable As CDO Fund's "Equitable" Owner

In addition to asserting that HCM is liable under a traditional veil piercing theory, Citi also seeks to hold HCM liable as CDO Fund's "equitable" owner. However, that theory fails for the same reason as above.

"New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner', notwithstanding the fact that the individual is not a shareholder of the corporation." Freeman v. Complex Computing Co., 119 F.3d 1044, 1051 (2d Cir. 1997). In such cases, "a nonshareholder defendant may be, in reality, the equitable owner of a corporation where the nonshareholder defendant exercises considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets are his alone to manage and distribute." Id. (alterations omitted) (internal quotation marks omitted). The Second Circuit applied the doctrine in Freeman to hold a company's consultant liable, despite the fact that he was neither a shareholder, officer, director, nor employee of the company. Id. 1051–52.

Importantly, however, the theory is not an alternative to veil piercing, but rather a recognition that veil piercing can apply to someone who is not a legal owner of a corporation if he exercises sufficient control and uses that control to commit a fraud or wrong. As the Second Circuit made clear in Freeman, the party seeking to apply the theory must still show that the "equitable" owner "commit[ted] a fraud or other wrong that resulted in un-

See Pl.'s Opp. 56.1 ¶ 169.

just loss or injury" to the plaintiff. Id. at 1053.

Thus, regardless of whether the record establishes that HCM was an "equitable" owner of CDO Fund, Citi's theory fails for the same reason as its traditional veil piercing theory above—*i.e.*, the absence of a fraud or wrong.

### D. HCM Is Not CDO Fund's "De Facto" General Partner

██ Citi next argues that HCM may be liable as CDO Fund's "de facto" general partner. Again, this theory fails for the same reason as above—the absence of a fraud or wrong.

Citi argues that HCM is CDO Fund's de facto general partner because, among other things, (1) HCM had sole responsibility for managing CDO Fund's operations; (2) CDO Fund's actual general partner (Highland GP), and that entity's general partner were both shells that were managed by HCM; and (3) Dondero controlled CDO Fund and executed certain agreements on behalf of all parties to the agreements. Citi's MSJ (ECF No. 201) at 22.

Citi's legal theory is unclear. Citi cites no case law under which one entity may simply be deemed another entity's "de facto" general partner. Rather, Citi must establish that HCM should be treated as CDO Fund's general partner (*i.e.*, Highland GP) by piercing the general partner's veil or treating the entities as alter egos. However, to pierce Highland GP's veil or hold Citi liable as its alter ego, Citi must still establish that HCM committed a fraud or wrong that injured Citi. See Int'l Equity Invs., Inc. v. Opp. Equity Partners, Ltd., 475 F.Supp.2d 456, 459 (S.D.N.Y. 2007) (" 'New York law allows the corporate veil to be pierced *either* when there is fraud or when the corporation has been used as an alter ego.' The latter normally requires 'a showing of ... complete control by the

dominating corporation that leads to a wrong against third parties.' " (quoting Wm. Passalacqua Builders, Inc., 933 F.2d at 138) (citation omitted) (alteration omitted)). Having failed to establish either a fraud or wrong, Citi's de facto general partner theory fails for the same reasons as above.

### E. HCM Is Not CDO Fund's "De Facto" Limited Partner

██ Citi's "de facto" limited partner theory likewise fails. Citi argues that HCM was a de facto limited partner because CDO Fund's two limited funds—the offshore and onshore feeders—were shell companies that were managed by HCM. Citi's MSJ (ECF No. 201) at 23. Citi then argues that HCM, as a de facto limited partner, can be liable as a general partner because it participated in CDO Fund's management. Id. Again, however, Citi's theory is predicated on a finding that the feeder funds' corporate forms should be ignored, which in turn requires finding that HCM committed a fraud or wrong that injured Citi. Having failed to do so, Citi's de facto limited partner theory also fails.

\* \* \*

Having rejected Citi's various theories, we find that HCM is not jointly and severally liable for Citi's counterclaims against CDO Fund and dismiss Citi's claims against HCM.

### III. Liability on Citi's Counterclaims

Apart from the issue of HCM's liability, the parties also dispute the status of Citi's counterclaims under which Citi seeks (1) to recover a $24 million deficit that Citi claims it is owed on account of CDO

Fund's breach and (2) indemnification.[15]

 Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." First Inv'rs Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (internal quotation marks omitted).

Here, the amount of damages is not before us, and there is no dispute over the first and third elements, i.e., that CDO Fund breached an agreement between the parties by failing to satisfy the December margin call. See M & O (ECF No. 150) at 33–50; id. at 60 (holding that "Citi had the right to foreclose and liquidate the collateral and offset the proceeds against amounts owed by CDO Fund"); Highland's Opp. MSJ (ECF No. 208) at 4 n.2 (conceding "the existence of a contract and non-performance by CDO Fund (by not meeting the Margin Call)").

That leaves only the issue of whether Citi performed under the relevant agreements. Although not raised in its motion papers, Highland argued at oral argument that Citi did not fully perform because it (1) failed to send CDO Fund a demand or deficit letter and (2) failed to provide CDO Fund an accounting or evidence of its deficit calculation. Oral Arg. Tr. at 48:14–50:5.[16]

 Even if true, contract law requires only substantial performance, not complete performance. Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., 821 F.3d 297, 311–12 (2d Cir. 2016) ("Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional." (internal quotation marks omitted)). We find that the deficiencies identified by Highland are no more than technical breaches, especially since we find implausible the notion that CDO Fund would have paid the deficit or indemnified Citi if Citi had merely issued a deficit notice or provided an accounting. Accordingly, we find that Citi is entitled to summary judgment on the liability portion of its counterclaims.[17]

## CONCLUSION

For the reasons set forth above, (1) Citi's motion seeking to hold HCM jointly and severally liable for any judgment awarded against CDO Fund is denied; (2) Highland's motion to dismiss HCM is granted; and (3) Citi's motion seeking to hold CDO Fund liable on Citi's counterclaims is granted. This Memorandum and Order resolves docket numbers 188 and 197.

**SO ORDERED.**

---

15. Although Citi's present motion seeks summary judgment as to CDO Fund's liability on the counterclaims, the parties' briefing is devoted almost entirely to the issue of HCM's liability, with each party only devoting a footnote to the issue of counterclaim liability.

16. Highland's conclusory statement that it raises various affirmative defenses to the counterclaims, including waiver, estoppel, election of remedies, unjust enrichment, and release, Highland's Opp. MSJ (ECF No. 208)

at 4 n.2, is insufficient to defeat summary judgment.

17. Nothing in this Memorandum and Order should be construed as addressing Citi's second counterclaim regarding distributions on certain Red River Preference Shares, see Citi's Am. Countercl. (ECF No. 43) ¶¶ 85–93, a counterclaim that neither party addressed and that does not appear to have been addressed in any of the numerous briefs submitted thus far in this case.